IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RICHARD CORNEJO, MARY CORNEJO, | § | |
| | § | |
| | § | SA-19-CV-01265-ESC |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | |
| | § | |
| EMJB, INC, IHAR SKARABRUKH, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>ORDER</u>

Before the Court in the above-styled cause of action are the following dispositive and non-dispositive motions:  Defendants' Motion for Partial Summary Judgment [#49], Plaintiffs' Motion to Exclude the Testimony of Defendants' Retained Testifying Expert Scott Yates [#72], and Plaintiffs' Motion for Sanctions Resulting from Defendants' Spoliation of Evidence [#75].

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.  The undersigned has authority to enter this Order as all parties have consented to proceed before a magistrate judge [#10, #11, #26, #27].  *See* 28 U.S.C. § 636(c)(1).

This action arises out of a motor vehicle accident occurring on May 31, 2019, between a vehicle operated by Plaintiff Richard Cornejo and a tractor-trailer owned by Defendant EMJB, Inc., and operated by Defendant Ihar Skarabrukh.  (Compl. [#1], at ¶ 7.)  Plaintiff Mary Cornejo was a passenger in the vehicle at the time of the crash.  (*Id.*)  According to Plaintiffs' Complaint, Skarabrukh was traveling northbound in the middle lane on Interstate Highway 35, when he made an unsafe lane change and struck Plaintiffs' vehicle.  (*Id.* at ¶ 7.)  Plaintiffs filed this suit against both EMJB and Skarabrukh, alleging both Plaintiffs sustained severe injuries due to

Defendants' negligence.  (*Id.* at ¶¶ 7, 30–33.)  Plaintiffs asserts claims of ordinary and gross negligence against both Defendants, negligence *per se* against Skarabrukh, and advance theories of *respondeat superior* liability and direct negligence for negligent hiring, training, supervision, and entrustment against EMJB.  (*Id.* at ¶ 9–29.)

Defendants have filed a motion for partial summary judgment, seeking summary judgment on Plaintiffs' claims of gross negligence, as well as Plaintiffs' direct negligence claims against EMJB [#49].  In response to the motion, Plaintiffs have filed a motion for sanctions [#75] based on the alleged spoliation of evidence, alleging the failure of Defendants to preserve two cell phones in Skarabrukh's possession at the time of the collision.  Plaintiffs claim that they cannot adequately respond to Defendants' motion for partial summary judgment on the question of Skarabrukh's gross negligence without these records, as the basis of their claim of gross negligence is Skarabrukh's cell phone usage while operating the tractor-trailer.  As a remedy for the alleged spoliation, Plaintiffs ask the Court to deny Defendants' motion for partial summary judgment on gross negligence and impose sanctions.  Finally, Plaintiffs have also filed a motion to exclude the testimony of Defendants' expert Dr. Scott Yates [#72].

The Court held a hearing on the motions on September 20, 2021, at which all parties appeared through counsel.  In rendering this opinion, the Court has also considered the following responses and replies to the motions [#52, #58, #77, #80, #78].  For the reasons that follow, the Court will deny without prejudice Plaintiffs' motion for sanctions, grant Defendants' motion for partial summary judgment in part, and deny Plaintiffs' motion to exclude Dr. Yates.

## I.  Plaintiffs' Motion for Sanctions

Plaintiffs' motion for sanctions is based on Defendants' alleged spoliation of evidence.  Plaintiffs contend that Defendants intentionally disposed of Skarabrukh's two cell phones and a

tablet in his possession at the time of the accident.  Plaintiffs argue they have been severely prejudiced by the spoliation, as the data and information on these electronic devices is critical to their theory of the case—that Skarabrukh was negligent or grossly negligent in part due to his cell phone usage at the time of the accident.

Plaintiffs asks the Court for the following sanctions for the spoliation: (1) denial of Defendants' motion for summary judgment on gross negligence because the alleged spoliation deprived them of the ability to prepare an adequate response to the motion; (2) a jury instruction on the adverse inferences that can be drawn from spoliation; and (3) an award of fees and costs associated with Plaintiffs' attempts to seek evidence Defendants knew was lost.  For the reasons that follow, the Court will deny the motion for sanctions but will allow Plaintiffs' claim of gross negligence to go before the jury.  The Court will also permit Plaintiffs to present evidence at trial on the alleged spoliation.  At the close of the evidence and on a full record, the Court will determine whether the evidence warrants any adverse instruction to the jury.

## A.    Legal Standard

In cases based on diversity jurisdiction, federal law applies to the issue of spoliation. *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005).  Rule 37(e) of the Federal Rules of Civil Procedure addresses the spoliation of electronically stored information ("ESI") and the electronic cell phone records at issue here.  There is no rule specifically addressing tangible evidence like the cell phones and tablet themselves.  This Court, however, has "inherent power to regulate the litigation process" where no rule expressly governs.  *Rinkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010).

Rule 37(e) provides that

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take

reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  In addition, a court has statutory authority to impose costs, expenses, and attorneys' fees on "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927.

The party seeking the spoliation sanction bears the burden of proof.  *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011) (internal quotation marks omitted).  A party seeking a sanction based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense, such that the spoliation resulted in prejudice to the innocent party.  *Rinkus Consulting Group*, 688 F. Supp. 2d at 615–16.

Giving an adverse instruction to the jury is considered a severe sanction that should not be imposed unless there is evidence of "bad faith."  *Id.* at 614.  "Mere negligence is not enough to warrant an instruction on spoliation."  *Russell v. Univ. of Tex. of Permian Basin*, 234 Fed. Appx. 195, 208 (5th Cir. 2007) (internal quotation and citation omitted).  Although the Fifth

Circuit has not directly addressed whether the standard of proof on spoliation issues is a preponderance of the evidence or the higher burden of clear and convincing evidence, courts regularly require clear and convincing evidence of misconduct before holding parties in civil contempt, imposing attorneys' fees under their inherent power, and imposing any punitive remedy.  *See In re Sealed Appellant*, 194 F.3d 666, 670–71 (5th Cir. 1999) (clear and convincing evidence of bad faith required when court sanctions attorney under its inherent powers); *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995) (surveying case law and requiring clear and convincing of litigation misconduct to impose sanction of default judgment).

**B.      Relevant Procedural History**

The evidence before the Court establishes the following facts relevant to Plaintiffs' spoliation motion.  Plaintiffs mailed Defendants spoliation letters in June 2019, within 30 days of the collision.  (Spoliation Ltrs. [#75-1], at 136–39.)  Suit was filed on October 25, 2019, and Plaintiffs first served discovery on Defendants related to the communication devices in the tractor-trailer at the time of the accident on June 12, 2020, requesting production of all documents reflecting usage and billing and production for inspection of any cell phones or other texting devices.  (First Requests for Production [#75-1], at 150–51, 183.)  Defendants objected to the requests as overbroad and refused to produce the requested documents and devices.  (*Id.*)

During the course of discovery, Plaintiffs discovered that Skarabrukh had two cell phones and a Samsung tablet in his possession at the time of the accident.  Plaintiffs subpoenaed cell phone records from Skarabrukh's two cell phone carriers, which established that Skarabrukh was on a 39-minute call at the time of the accident in question with a phone number belonging to a woman named "Anastasia."  (Verizon Records [#75-1], at 10.)  The records also revealed several

calls with Anastasia's number in the three days prior to the accident, with many calls lasting over an hour and ending close to midnight.  (*Id.* at 8–10.)  However, these subpoenaed records from the cell carriers only provided information related to voice calls and did not contain any record of text messages or other data.

Plaintiffs requested a forensic download of the phones as originally requested in Plaintiffs' request for production, but the parties could not reach an agreement as to the scope of the examination, which led to Plaintiffs filing a motion to compel.  Prior to the Court's hearing on the motion to compel, Defendants agreed to produce the cell phones for download and inspection, and the parties agreed to a protocol and that the inspection would be held on May 25, 2021.  (Protocol [#75-1], at 14–15; E-mail Correspondence [#75-1], at 17.)  On May 24, 2021, counsel for Defendants advised Plaintiffs that Skarabrukh's phones had been stolen or lost and were therefore unavailable for inspection.

The Court held a status conference on May 26, 2021, at which the parties discussed the issue of the lost or stolen cell phones and Skarabrukh's failure to provide Plaintiffs with any information about the identity of Anastasia.  The Court permitted Plaintiffs to serve a second set of interrogatories and requests for production on Skarabrukh with a 10-day response deadline on the limited issue of the loss or theft of the cell phones.  Skarabrukh did not respond to the discovery requests by the response deadline, and Defense counsel advised Plaintiffs that no responses would be served because they were unable to communicate with their client.  Plaintiffs filed a second motion to compel on June 9, 2021.

On June 18, 2021, Defendants filed their motion for partial summary judgment.  In response, Plaintiffs filed a motion asking for an extension of time to file a response to the motion so that they could attempt to obtain additional evidence on Skarabrukh's cell phone usage at the

time of the crash.  On June 23, 2021, the Court held a hearing on Plaintiffs' motion to compel and motion for an extension of time.  After the hearing, the Court ordered Skarabrukh to appear for a second deposition on limited questions related to the cell phones and the identity of Anastasia; ordered him to respond to the outstanding discovery; and granted Plaintiffs additional time to supplement their response to the motion for summary judgment.

Skarabrukh's responses to Plaintiffs' Second Set of Interrogatories state that he first discovered his cell phones were missing on May 16, 2021, around lunch time while he was in New York City but that he does not know if they were stolen or simply misplaced.  (Resp. [#75-1], at 20.)  Skarabrukh did not file a police report or insurance claim, but he produced a receipt for the purchase of a new phone at a Verizon store from that day.  (*Id.*)  Skarabrukh could not provide any responsive documents to Plaintiffs' request for documentation or correspondence regarding the alleged lost or stolen phones.  (Resp. [#75-1], at 23.)

Plaintiffs took a second deposition of Skarabrukh on August 19, 2021, limited to questions related to the loss of his cell phones and the identity of "Anastasia."  At the deposition, Skarabrukh was unable to provide the last name for Anastasia, could not recall how he met her, and had no information that might help Plaintiffs locate her as a witness in this case.  (Skarabrukh Dep. [#75-1], at 120.)  Consistent with his written discovery responses, Skarabrukh testified in his second deposition that he had no recollection of what happened to his cell phones, whether they were lost or stolen, what he was doing at the time the cell phones disappeared, or how he uses his cell phone typically in a given day.  (*Id.* at 122–26.)

## C.   Analysis

Based on the evidence before the Court, there can be no dispute that Skarabrukh had a duty to preserve his cell phones at the time of their loss.  Not only did Plaintiffs send spoliation

letters prior to the filing of this suit, but they have also repeatedly sought discovery related to Plaintiffs' communication devices since the inception of this case, through written discovery requests, requests for production and inspection, and by filing two motions to compel.  The evidence also demonstrates that Plaintiffs' counsel specifically instructed Skarabrukh at his first deposition in November 2020 of his duty to preserve his cell phones as possible evidence in this case.  (Skarabrukh Dep. [#75-1], at 44:5–44:16.)  Plaintiffs have therefore satisfied their burden to demonstrate that Skarabrukh, the party with control over the evidence at issue, had an obligation to preserve the cell phones and the duty had arisen well before the cell phones disappeared.  *See Ashton*, 772 F. Supp. 2d at 799.

The Court also finds that Skarabrukh's cell phones constitute evidence relevant to Plaintiffs' negligence and gross negligence claims; furthermore, Plaintiffs' inability to obtain complete discovery regarding how Skarabrukh was using these devices at the time of the crash has caused Plaintiffs prejudice.   *See id.*   If, for example, Skarabrukh was exchanging photographs with Anastasia during the call via text, this fact could provide support for Plaintiffs' theory of Skarbrukh's negligence or gross negligence in the operation of his vehicle, regardless of whether he was using a hands-free device during the voice call, as he testified in his deposition.

The question is therefore whether there is clear and convincing evidence that Skarabrukh destroyed his cell phones with a culpable state of mind.  *See id.*  Clear and convincing evidence is a high standard, requiring evidence "so direct and weighty as to leave the factfinder with a firm belief in the truth of the facts" at hand.  *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). Defendants maintain that there is no evidence that Skarabrukh destroyed his cell phones by

intentionally discarding them, only that Skarabrukh has a poor memory and at most acted carelessly.

Although the Court agrees that there is no direct evidence establishing Skarabrukh's bad faith, a jury could nonetheless infer some degree of culpability based on several pieces of circumstantial evidence, including the timeline of Plaintiff's attempts to obtain discovery, Skarabrukh's failure to timely respond, his inability to recall relevant details, and the disappearance of his phones on the eve of the scheduled inspection.  Because the evidence has generated a fact question on the question of Skarabrukh's bad faith, the jury should be permitted to hear the evidence surrounding the loss or theft of the cell phones and, if the Court determines a spoliation instruction is warranted, the jury should be permitted to draw adverse inferences against Skarabrukh as to the missing evidence.

Defendants maintain that the Court must make the determination of bad faith now and is not permitted to allow the evidence regarding the disappearance of Skarabrukh's cell phones to the jury without such a finding.  The Court disagrees.  The Fifth Circuit has cited with approval the decision of a district court to give "both parties the freedom to put forward evidence about document destruction" and to defer a decision on whether a spoliation instruction is warranted until the close of trial.  *See BCE Emergis Corp. v. Cmty. Health Sols. of Am., Inc.*, 148 F. App'x 204, 219 (5th Cir. 2005).  And courts have submitted the fact question of bad faith to the jury. *See, e.g.*, *Rimkus*, 688 F. Supp. 2d at 620, 646–47 (allowing jury to hear evidence on spoliation to make its own bad-faith determination and to decide whether to ultimately draw an adverse inference that lost information would have been unfavorable to defendants).  Furthermore, if the Court ultimately concludes that the evidence presented at trial is insufficient to prove Skarabrukh's bad faith and no spoliation instruction is warranted, the jury is still free to weigh

the evidence relevant to spoliation in conjunction with the other evidence to be presented at trial as it is relevant to other matters.   For instance, the jury can weigh the evidence regarding Skarabrukh's serendipitous loss of his cell phones on the eve of their scheduled inspection when evaluating the credibility of Skarabrukh's testimony about his cell phone use.  *See Russell*, 234 Fed. App'x at 208 ("The fact that the jury did not hear the spoliation instruction did not seriously impair Dr. Russell's ability to present her case because the jury heard testimony that the documents were important and that they were destroyed . . . and was free to weigh this information as it saw fit.").

In summary, the Court finds there is a fact issue on the question of whether Skarabrukh acted in bad faith and destroyed evidence relevant to Plaintiffs' claims.  The court will therefore allow the parties to marshal their respective evidence on this issue for the jury.  Regarding Plaintiff's request for an award of costs and fees associated with their discovery motions and this spoliation motion, the Court will deny this requested relief without prejudice.  Plaintiffs may renew their request for fees after the Court has heard all the evidence and testimony on spoliation at trial. However, the Court will grant Plaintiffs' request that the Court deny Defendants' motion for summary judgment on Skarabrukh's gross negligence claim due to the alleged spoliation. The Court agrees with Plaintiffs that this claim should proceed to trial and go before the jury, along with the spoliation evidence.  The jury's resolution of the gross negligence claim will depend in part on how they view the spoliation evidence, whether they receive a spoliation instruction, and how this evidence affects their assessment of Skarabrukh's ultimate credibility as a witness.

## II.  Defendants' Motion for Partial Summary Judgment

Defendants seek summary judgment on Plaintiffs' claims of gross negligence against both EMJB and Skarabrukh and on Plaintiffs' claims of direct negligence against EMJB.  As previously noted, the Court will deny Defendants' motion as to Plaintiffs' gross negligence claim against Skarabrukh due to the spoliation issue.  EMJB has, however, established that it is entitled to summary judgment as a matter of law on Plaintiffs' claim of gross negligence and direct negligence against EMJB.

### A.    Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial.  *Miss. River Basin Alliance v. Westphal*, 230 F.3d

170, 174 (5th Cir. 2000).  The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The Court will view the summary judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."  *Westphal*, 230 F.3d at 174.

**B.     Gross Negligence Claim against EMJB**

Plaintiffs allege that EMJB was grossly negligent with respect to various acts causing Plaintiffs' injuries.  (Compl. [#1] at ¶¶ 26–29.)  EMJB contends that Plaintiffs cannot establish their claim of gross negligence against EMJB as a matter of law.  The undersigned agrees.

Texas law governs this diversity action.  *R & L Inv. Prop., L.L.C. v. Hamm*, 715 F.3d 145, 148–49 (5th Cir. 2013).  Under Texas law, a plaintiff is entitled to punitive damages upon a showing of gross negligence.  *Hansen v. Johns-Manville Prod. Corp.*, 734 F.2d 1036, 1040 (5th Cir. 1984).  To impose punitive damages on an employer for the acts of its employee, there must be clear and convincing evidence that: (1) the employer itself committed gross negligence by authorizing or ratifying the grossly negligent actions of its employee; or (2) a vice principal (corporate officer, supervisors, etc.) of the employer committed separate grossly negligent acts. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921–22 (Tex. 1998).

To conclude EMJB committed gross negligence, there must be both objective and subjective proof that (1) viewed objectively from the standpoint of EMJB at the time of the events underlying this suit, the act or omission of EMJB involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) EMJB had

actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.  *Id.* at 921.

Plaintiffs must prove these requirements by clear and convincing evidence.  *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 166 (Tex. 2005).  The "clear and convincing" burden "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Civ. Prac. & Rem. Code § 41.001(2).  This is a high burden, as "punitive damages are proper only in the most exceptional cases."  *Cont'l Coffee Prod. Co. v. Cazarez*, 937 S.W.2d 444, 454 (Tex. 1996) (internal quotation and citation omitted).

Plaintiffs have not proffered any evidence that any officer of EMJB authorized or ratified Skarabrukh's cell phone usage or his alleged unsafe lane change on the day of the accident, the only bases of Plaintiffs' claims of gross negligence on the part of Skarabrukh.  (*See* Resp. [#52], at 8–9.)  Nor is there evidence, let alone clear and convincing evidence, to support the allegation that EMJB itself committed acts involving an extreme degree of risk and had subjective awareness of such risk.  *See Ellender*, 968 S.W.2d at 921.

The only evidence cited by Plaintiffs on EMJB's direct negligence is its failure to conduct a pre-hiring verification of Skarabrukh's employment history, its adoption of two conflicting cell phone policies regarding whether drivers are permitted to use hands-free devices while operating company vehicles, and its failure to provide any driver training for Skarabrukh regarding cell phone use or driver safety upon his hiring.  Although this evidence could bear on the alleged ordinary negligence of EMJB, it is not evidence of EMJB engaging in conduct involving an extreme degree or risk of the magnitude required to find gross negligence and impose punitive damages.

For example, the record contains evidence that Skarabrukh's employment application contained a reference to prior employment with a company called Patriot Trucking, but Plaintiffs subpoenaed the company's records and discovered there was no record of Skarabrukh ever working there.  (Patriot Records [#52-1], at 80.)  Mantas Bliuvas, President of EMJB, testified in his deposition that he was not aware that Skarabrukh had misrepresented his previous employment history on his application.  (M. Bliuvas Dep. [#52-1], at 222.)  EMJB's apparent failure to ensure Skararbrukh accurately represented his prior employment in his application does not constitute evidence that EMJB acted with conscious indifference to an extreme risk of Skarabrukh engaging in the alleged unsafe driving practices at issue in this case.  Such failure might be viewed differently if the evidence showed EMJB had, for example, knowingly disregarded a record of Skarabrukh having a suspended license or history of safety violations.

As to the cell phone policies, Skarabrukh's employee file contains two signed cell phone policies, one that EMJB "employees may not use cellular telephones or mobile devices while operating a motor vehicle under any of the following situations, regardless of whether a hands-free device is used . . . [w]hen employee is operating a vehicle owned, leased or rented by the Company."  (Cell Phone Policy [#52-1], at 82.)  Skarabrukh also signed a separate acknowledgment of his compliance with Federal Motor Carrier Safety Act restrictions on the use of cell phones without a hands-free device.  (Acknowledgment [#52-1], at 88.)  Mr. Bliuvas's wife testified in her deposition that the old policy—the complete ban on cell phones—was accidentally included in Skarabrukh's employee file.  (J. Bliuvas [#52-1], at 47.)  That EMJB erroneously had Skarabrukh sign two contradictory policies regarding cell phone use is also not evidence of grossly negligent conduct involving an extreme degree of risk; both policies

prohibited the use of cell phones without a hands-free device.  Again, this is at most in the realm of ordinary negligence, not gross negligence.

Finally, regarding company training, Skarabrukh testified in his deposition that he did not receive any training from EMJB prior to beginning his employment with the company.  (Nelson Aff. [#52-1], at 58–59.)  Both Mr. and Ms. Bliuvas testified consistently—that EMJB employees are not given any kind of training on Federal Motor Carrier Safety Regulations upon hiring.  (J. Bliuvas Dep. [#52-1], at 119; M. Bliuvas Dep. [#52-1], at 231.)  Although some commercial trucking companies may choose to provide such training, the Texas Supreme Court has found that an "employer has no duty to warn or instruct an employee "with regard to dangers that are ordinarily incident to driving a vehicle and require no special skills or knowledge other than that expected of all licensed drivers"—skills such as changing lanes.  *Nabors Drilling, USA, Inc. v. Escoto*, 288 S.W.3d 401, 413 (Tex. 2009) (quoting *Nat'l Convenience Stores Inc. v. Matherne*, 987 S.W.2d 145, 149 (Tex. App.—Houston [14th Dist.] 1999, no pet.))  EMJB's failure to instruct Skarabrukh on the safe operation of a tractor-trailer is not evidence of gross negligence.

Plaintiffs have failed to generate a genuine issue of material fact on EMJB's gross negligence, and the Court will grant EMJB summary judgment on this claim.

## C.    Direct Negligence of EMJB

The Court will also grant EMJB summary judgment on Plaintiffs' claims of direct negligence.  Plaintiffs seek to hold EMJB liable for negligence under the doctrine of *respondeat superior* liability for the negligence of Skarabrukh and for its own direct negligence based on a number of theories.  (Compl. [#1], at ¶¶ 18–25.)  These theories include the failure to hire a qualified driver, inadequate driver qualifications, failure to train and supervise, improper and inadequate vehicle maintenance, use of unsafe equipment, negligent entrustment of vehicle,

negligent retention, and negligent contracting.  (*Id.* at ¶¶ 23.)  Defendants move for summary judgment on Plaintiffs' direct negligence claims on the basis that such claims are superfluous where the vicarious liability claim has been established via admission or stipulation that the employee was in the course and scope of employment at the time of the accident.  The Court agrees.

The Texas Supreme Court has held that negligent hiring requires proof that the employer was negligent in hiring the employee, the employee was subsequently negligent, and both negligent acts proximately caused the plaintiff's injury.  *Endeavor Energy Resources, L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019).  Although the Texas Courts of Appeals have recognized claims of negligent supervision, training, and retention, the Texas Supreme Court has not ruled definitively on the existence, elements, and scope of these torts.  *Sanchez v. Transportes Internacionales Tamaulipecos S.A de C.V.*, No. 7:16-CV-354, 2017 WL 3671089, at *2 (S.D. Tex. July 20, 2017) (citing *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010)).  "Regardless, to the extent that these are viable claims under Texas law, they are based on an employer's direct negligence rather than its vicarious liability."  *Id.* (citations omitted).

Texas law "instructs that where a plaintiff alleges ordinary (rather than gross) negligence, and the employer stipulates to its vicarious liability for its employee's negligence, a respondeat superior claim and the type of direct negligence claims asserted here are 'mutually exclusive' means of recovering from the employer."  *Id.* at *2 (collecting cases); *see also Ochoa v. Mercer Transp. Co.*, No. 5:17-CV-1005-OLG, 2018 WL 7505640, at *3 (W.D. Tex. Dec. 10, 2018) (granting summary judgment as to direct negligence claim where employer stipulated to vicarious liability).

EMJB does not dispute that Skarabrukh was acting in the course and scope of his employment with EMJB at the time of the accident underlying this suit, and in doing so has stipulated to its vicarious liability for any negligent acts or omissions of Skarabrukh.  (M. Bliuvas Dep. [#49-1], at 18; Mot. for Summ. J. [#49] at 3.)  Accordingly, if a jury were to conclude that Skarabrukh was negligent and that his negligence proximately caused Plaintiff's injuries, EMJB would bear vicarious liability for his negligence regardless of any inadequacy in its hiring, training, supervision, or retention of him as an employee.  *Ochoa*, 2018 WL 7505640, at *3.    Further, if the factfinder determines that Skarabrukh was not negligent, then any negligence on the part of EMJB in its hiring, supervision, training, or retention of Skarabrukh could not have served as the proximate cause of Plaintiff's damages.   *Sanchez*, 2017 WL 3671089, at *2.  Thus, Defendants are entitled to summary judgment on Plaintiffs' claims against EMJB for direct negligence as well.

### III.  Plaintiffs' *Daubert* Motion

Plaintiffs have moved to exclude the testimony of Defendants' retained expert Scott Yates.  Defendants designated Dr. Yates as a medical billing expert to provide testimony on the reasonableness of Plaintiffs' claimed medical expenses associated with the accident at issue.  Dr. Yates has submitted opinions (in the form of counter-affidavits under Section 18.001 of the Texas Civil Practices and Remedies Code)[1] that Plaintiffs' medical expenses—both their past expenses and proposed future surgeries—are not reasonable and customary when compared to

---

[1] Plaintiffs have not filed a motion for leave to file medical affidavits pursuant to Section 18.001 in this case.  The undersigned has previously held that Section 18.001 is a procedural provision inapplicable in federal diversity cases.    However, if the parties agree to this streamlined method of proof, the undersigned has permitted its use.  *See, e.g.*, *Stokes v. Chan*, SA-17-CV-318-FB-ESC (Apr. 24, 2018) (dkt. 44).

the reimbursement rates of private insurers and Medicare for the same procedures and treatment. Plaintiffs have elected not to use insurance and are self-pay with all their medical providers.

Counter-affidavits must be submitted by an expert.  Tex. Civ. Prac. & Rem. Code § 18.001(f).  Section 18.001(f) provides that a counter-affidavit must (1) give reasonable notice of the basis on which the party serving it intends at trial to controvert the claim reflected by the initial affidavit; (2) be taken before a person authorized to administer oaths; and (3) be made by a person who is qualified, by knowledge, skill, experience, training, education, or other expertise, to testify in contravention of all or part of any of the matters contained in the initial affidavit.  *Id.* Once a counter-affidavit has been served, Plaintiffs are required to prove the reasonableness of the cost of their treatment via expert testimony at trial.  *See id.* at § 18.001(b) ("Unless a controverting affidavit is served . . . , an affidavit . . .  is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.")

Plaintiffs ask the Court to strike Dr. Yates's expert designation under Federal Rule of Evidence 702 and the Supreme Court's standard for the admissibility of expert testimony as set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  The resolution of Plaintiffs' motion bears not only on Dr. Yates's ability to testify as an expert at trial but also on his authority to author the counter-affidavits in evidence pursuant to Section 18.001.

## A.     Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that any scientific testimony or evidence admitted is not only relevant, but reliable.  Subsequent to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness "qualified as an expert . . . may testify . . . in the form of

an opinion . . . if (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.   The *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical" analysis and other "specialized knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony.  *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  A district court enjoys broad discretion in determining the admissibility of expert testimony, and such decisions will not be disturbed on appeal unless a ruling is "manifestly erroneous."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

## B.     Analysis

The record contains two reports/counter-affidavits by Dr. Yates—one assessing the reasonableness of Plaintiffs' chiropractic and pain management treatment already received at TriCity Pain Associates and a supplemental report evaluating the reasonableness of proposed charges for spinal surgeries not yet performed.  (Expert Reports [#72-2], at 147–52.)  Dr. Yates opines that the past medical treatment of Plaintiffs should have cost less than $3,000, when TriCity billed Plaintiffs $68,000.  (*Id.* at 149.)  Dr. Yates opines that the proposed surgeries for Plaintiffs should cost less than $22,000, when Plaintiffs have been given an estimated cost of more than $300,000 from their providers.  (*Id.* at 152.)

Plaintiffs challenge the qualifications of Dr. Yates to be designated as an expert, the reliability of his conclusions, and the relevance of his opinions.  None of these challenges has merit and Plaintiffs' *Daubert* motion is denied.

### i.   Dr. Yates is qualified to testify as an expert in this case.

The record before the Court establishes that Dr. Yates is qualified to testify as an expert on the reasonableness of Plaintiffs' medical expenses.  Dr. Yates is licensed to practice medicine in Texas, board-certified in internal medicine, and a fellow of the American College of Physicians and Physician Executives.  (Yates C.V. [#72-2], at 5.)  In addition to his medical degree, Dr. Yates has master's degrees in healthcare administration (MHA), health services (MHS), and business administration (MBA).  (*Id.*)  Dr. Yates currently provides both inpatient and outpatient primary care and consultative medical services and has 20 years of experience practicing medicine.  (*Id.*; Expert Report [#72-2], at 33.)  He is currently on staff at four acute care medical centers in the Greater Dallas area, has served as past Chief of Staff at Baylor Medical Center Carrollton, currently chairs the Clinical Practice Committee at Texas Health Presbyterian Hospital Plano, and has served as a member or chair of both physician peer-review and hospital-wide quality of care committees.  (Expert Report [#72-2], at 33.)  Dr. Yates is also on the board of directors of a 1,500-member physician group and has conducted medical billing reviews as part of his work with the Texas Medical Foundation.  (Yates C.V. [#72-2], at 120; Yates Dep. [#72-2], at 58, 63.)

Plaintiffs argue that Dr. Yates is not qualified to opine on the reasonableness of Plaintiffs' medical treatment from pain management physicians and orthopedists because he is an internist and does not personally see patients who have been involved in car wrecks.  Plaintiffs

also take issue with Dr. Yates's lack of certification in billing and coding.  Both of these arguments miss the mark.

Dr. Yates has not been designated to testify as to whether the treatment Plaintiffs received was necessary to treat their alleged injuries.  Dr. Yates has been designated to opine on the reasonableness of the claimed medical expenses in this case.  Through his opinions and the data used to support them, Dr. Yates is providing the jury with billing comparators from data available to him as a board member of a 1,500-member physician group.  There is no requirement that Dr. Yates be an orthopedist or pain management physician to testify on the customary rates for various medical procedures billed to his physician group for patients insured through Medicare and private insurers.

In fact, the Supreme Court of Texas has concluded that insurance agents and even non-physicians can provide expert testimony on medical costs, so long as they have access to and experience with billing databases that provide the basis for their opinions.  *See Gunn v. McCoy*, 554 S.W.3d 645, 673 (Tex. 2018) ("[I]t is not uncommon or surprising that a given medical provider may have no basis for knowing what is a 'reasonable' fee for a specific service" but insurance agents who have access to national and regional databases on which they can compare prices "are generally well-suited to determine the reasonableness of medical expenses."); *see also In re Allstate Indemnity Co.*, 622 S.W.3d 870, 877–78 (Tex. 2021) (extending reasoning in *Gunn* to conclude to hold that registered nurse with extensive experience with billing and coding through use of nationwide database was qualified as a medical coding and auditing expert).

Although Dr. Yates's primary day-to-day responsibilities do not concern medical billing review, Dr. Yates testified in his deposition that he interacts regularly with billing evaluations for reasonableness in conjunction with his responsibilities re-credentialing physicians within his

1,500 physician group and as a member of the credentials committees for several hospitals. (Yates Dep. [#72-2], at 59, 70.)   As previously noted, Dr. Yates has also conducted medical billing reviews up to five or six times per year for the past decade as part of his work with the Texas Medical Foundation.   (*Id.* at 63.)   Dr. Yates has sufficient experience in medicine, business, and medical administration and is qualified to testify as an expert on agreements between physicians, hospitals, and payors and the reasonable amounts charged for various medical services.   Any of the issues raised by Plaintiffs as to Dr. Yates's qualifications and the extent of his familiarity with medical billing are best addressed through cross-examination.

ii.      **Dr. Yates's opinions are sufficiently reliable to assist the trier of fact.**

The Court also finds the opinions contained in Dr. Yates's reports to be sufficiently reliable to assist the trier of fact.   In evaluating the reasonableness of Plaintiffs' medical charges, Dr. Yates consulted the reimbursement rates provided to his physician group from Blue Cross, United, Aetna, and Cigna, as well as the publicly available Medicare rates from the Center for Medicare and Medicaid Services.   (Yates Dep. [#72-2], at 69.)   Dr. Yates then looked at the amount billed and the corresponding CPT code for treatment, then compared it both to the Medicare-allowable rate and a calculation of the average third-party payment in the Dallas-Fort Worth area.   (Report [#72-2], at 148–52.)   Dr. Yates has provided a spreadsheet with the mean reimbursement rates for these payors.   (*Id.* at 153.)

Plaintiffs contend that the methodology and data used by Dr. Yates to evaluate the reasonableness of Plaintiffs' medical expenses is unreliable because his data pool is from a 1,500 physician group located in Dallas, not San Antonio, and Dr. Yates could not testify to how many of the physicians in his group are orthopedic surgeons.   These arguments are also best addressed on cross-examination at trial.

22

Reliability challenges raise concerns about the scientific validity of an expert's methodology. The Supreme Court has endorsed a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Moore v. Ashland Chem., Inc.* 151 F.3d 269, 275 (5th Cir. 1998) (citing *Daubert*, 509 U.S. at 593–95).

None of these factors are implicated by Plaintiffs' purported reliability challenge. Dr. Yates's methodology is straightforward: he has compared data on amounts paid by Medicare and private insurers to physicians in his 1,500 physician group for the same procedures and treatment received by or recommended to Plaintiffs in the future. Dr. Yates has expressed his opinion that geographic and contract rate variations are generally small; payment amounts to a very large physician group are often higher than for small group of single-physician practices due to market forces; and the contract amounts he consulted are similar to those detailed in published analyses of very large physician claim databases with which he is familiar. (Report [#72-2], at 34.) Defendants' challenges are not truly about methodology and scientific reliability as much about whether Dr. Yates's data—in terms of both sample size and geographic variations—make it less effective as comparator data. The Court will not exclude Dr. Yates's opinions on this basis, and Plaintiffs' concerns may be addressed through cross-examination at trial.

iii.     **Dr. Yates's opinions are relevant to the reasonableness of Plaintiffs' claimed medical expenses.**

Finally, Plaintiffs contend that Dr. Yates's opinions, which are based on the reimbursement rates of private insurers and Medicare, are not relevant to the question of the reasonableness of Plaintiffs' medical expenses because Plaintiffs have elected to pay for all of their medical treatments as self-pay.  Plaintiffs argue that the amount Plaintiffs might have owed under different circumstances—if Plaintiffs elected to participate in Medicare or use private insurance—has no bearing on what the Plaintiffs will actually owe their providers and therefore should not be admissible.  Plaintiffs invoke the collateral-source rule as support for this argument, arguing that a reduction of Defendants' liability because of benefits received by Plaintiffs from some other source, including Medicare or private health insurance, are barred by this rule.  The Court disagrees.

Plaintiffs may only recover those expenses determined to be reasonable, and "proof of the amount charged does not in itself constitute evidence of reasonableness."  *In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 249 (Tex. 2021) (orig. proceeding), reh'g denied (Sept. 3, 2021).  In *In re K & L Auto Crushers*, the Texas Supreme Court held that medical providers' negotiated rates and fee schedules with private insurers and public-entity payors are both relevant and discoverable on the issue of reasonableness of the rates charged to uninsured patients or those electing to proceed as self-pay for the same services in the context of personal injury litigation.  *Id.* at 244.  "If a claimant agrees or is required to pay a medical provider more than a reasonable amount, the difference between the amount paid and a reasonable amount is not 'a necessary and usual result of the tortious act,' but of the claimant's or provider's conduct."  *Id.* (quoting  *J & D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016)).  The amount the plaintiff was charged and the amount the provider charged others both constitute

relevant (but not dispositive) evidence for a jury to consider in evaluating whether the rate charged to the plaintiff is reasonable.   In light of this holding, the fact that Plaintiffs—by choosing to not use insurance—might have increased the amount charged for their medical expenses is a fact relevant to the reasonableness of their medical expenses and not a basis for excluding Dr. Yates's testimony.

Moreover, the collateral-source rule is not at issue here.   This Texas common-law rule bars a tortfeasor from reducing liability by the amount a plaintiff recovers from independent sources.  *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 358 (5th Cir. 2016); *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011).  This rule is both substantive and evidentiary and disallows evidence of insurance or other collateral payments that may influence a factfinder. *Deperrodil*, 942 F.3d at 358.   Dr. Yates is not attempting to introduce into evidence any information regarding collateral benefits to which either Plaintiff might be entitled.   His testimony goes to the question of the reasonableness of Plaintiffs' claimed damages in the first instance.

### IV.  Conclusion and Order

In summary, having considered the parties' motions, the various responses and replies thereto, the summary judgment record, and the arguments of counsel at the Court's hearing on the motions,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment [#49] is **GRANTED IN PART AND DENIED IN PART** as follows:

-   Defendants' motion for summary judgment with regard to Plaintiffs' claims against EMJB for direct negligence and gross negligence is **GRANTED.**

-   Defendants' motion for summary judgment with regard to Plaintiffs' claim against Skarabrukh for gross negligence should be **DENIED**.   This claim, along with

Plaintiffs' claims against Skarabrukh for simple negligence and against Defendant EMJB as to *respondeat superior* liability, should proceed to trial.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude the Testimony of Defendants' Retained Testifying Expert Scott Yates [#72] is **DENIED**.

**IT IS FINALLY ORDERED** that Plaintiffs' Motion for Sanctions Resulting from Defendants' Spoliation of Evidence [#75] is **DENIED WITHOUT PREJUDICE** to reasserting the request for a spoliation instruction and fees and costs associated with seeking discovery related to Skarabrukh's cell phones at the close of the evidence or after trial.

SIGNED this 4th day of October, 2021.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE